# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **BARRY MICHAEL LADD,** | : | |
| **Plaintiff** | : | **CIVIL ACTION** |
| | : | |
| **vs.** | : | |
| | : | |
| **THE BOEING COMPANY,** | : | |
| **Defendant** | : | **NO. 06-28** |

## MEMORANDUM AND ORDER

GENE E.K. PRATTER, J.                                          FEBRUARY 8, 2008

Barry Michael Ladd, a final assembly inspector employed by The Boeing Company ("Boeing"), claims that he was the victim of racial discrimination in violation of Title VII, 42 U.S.C. § 2000e, et seq. ("Title VII"), and 42 U.S.C. § 1981 ("Section 1981"). Mr. Ladd makes claims against his employer under Title VII for disparate treatment, disparate impact and retaliation. He also seeks relief under Section 1981 for racial/ethnic discrimination.

Boeing moves for summary judgment. The company argues that Mr. Ladd (1) cannot pursue untimely and unexhausted discrimination claims; (2) fails to establish *prima facie* cases of discrimination or retaliation; (3) fails to demonstrate that Boeing's justification for its actions is mere pretext; and (4) has not identified any factual basis for his disparate impact claim.

For the reasons set forth below, Boeing's Motion for Summary Judgment is granted as to Count II (Title VII disparate impact), but denied as to Count I (Title VII disparate treatment), Count III (Title VII retaliation) and Count IV (§ 1981 discrimination).

-1-

## I.   **LEGAL STANDARD**

Upon motion of a party, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  Summary judgment may be granted only if the moving party persuades the district court that "there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." Miller v. Ind. Hosp., 843 F.2d 139, 143 (3d Cir. 1988).  An issue is "genuine" if a reasonable jury could possibly hold in the non-movant's favor with regard to that issue. See, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  A fact is "material" only if it could affect the result of the suit under governing law. Id.

Evaluating a summary judgment motion, the court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor. Hugh v. Butler County Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005).  If, after making all reasonable inferences in favor of the non-moving party, the court determines that there is no genuine issue of material fact, summary judgment is appropriate. Celotex Corp. V. Catrett, 477 U.S. 217, 322 (1986); Wisniewski v. Johns-Manville Corp., 812 F.2d 81, 83 (3d Cir. 1987).

The party opposing summary judgment must support each essential element of that party's opposition with concrete evidence in the record. Celotex, 477 U.S. at 322-23.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted).  This requirement upholds the "underlying purpose of summary judgment [which] is to avoid a pointless trial in cases where it

is unnecessary and would only cause delay and expense." <u>Walden v. Saint Gobain Corp.</u>, 323

F.Supp. 2d 637, 642 (E.D. Pa. 2004) (restating <u>Goodman v. Mead Johnson & Co.</u>, 534 F.2d 566,

573 (3d Cir. 1976)).


## II.   FACTUAL BACKGROUND

To describe the background of this case, the Court sets out those facts of record that are

undisputed.  Moreover, they are construed in the light most favorable to Mr. Ladd.  However, the

Court disregards Mr. Ladd's factual allegations that do not have evidentiary support from the

record.  <u>See</u>, <u>Celotex Corp. V. Catrett</u>, 477 U.S. 317, 322-23 (1986); <u>Jones v. United Parcel</u>

<u>Service</u>, 214 F.3d 402, 407 (3d Cir. 2000) (requiring more than "unsupported allegations" to

defeat summary judgment).  Thus, the following factual recitation notes those instances where

Mr. Ladd disputes Boeing's factual contentions, but provides no evidentiary basis from the

record for those disputes.  In those respects, Boeing's factual contentions are treated as

undisputed.  <u>See</u>, <u>Blaylock v. City of Philadelphia</u>, 504 F.3d 405, 413 (3d Cir. 2007) (citing

<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986)) (when the record contradicts a party's

description of the facts, it does not create a genuine dispute).  The Court has accepted as true all

other factual contentions made by Mr. Ladd and construed them in the light most favorable to

him.

### A.   Barry Michael Ladd's Employment History

Boeing is a major aerospace company and one of the largest manufacturers of commercial

jetliners and military aircraft.  At its facility in Ridley Park, Pennsylvania, Boeing manufactures

aircraft primarily for the United States Department of Defense.

Mr. Ladd began working at Boeing in August 1975 as a tool crib attendant.[1] Except during leaves of absence related to his service with the United States Marine Corps, Mr. Ladd spent the next 20 years in the company's Quality Assurance division. His duties primarily consisted of pre-flight inspection of aircraft. As an off-site inspector, Mr. Ladd worked in fabrication and development of aircraft (part of the research and development department). As a senior inspector, he worked on the "Comanche Program," which was a select development program that produced two unique Comanche aircraft. Mr. Ladd also worked as a senior inspector in final assembly, fuselage inspection, composite inspection and whirl tower inspection

Since 1998, Mr. Ladd has worked as a Final Assembly Inspector. By 1999, Mr. Ladd had attained the position of lead inspector of the V-22 Program, and two years later, Mr. Ladd was third in seniority by job classification as an inspector in final assembly. His job title and pay grade have remained constant since 1999, but his hourly pay rate has increased from $23.61 in January 1998 to $30.49 in June 2006. During his employment as a Final Assembly Inspector between January 2002 and May 2006, Mr. Ladd has earned more than $82,000 in overtime, although he turned down some weekend overtime opportunities and often turned down overtime on weekdays.

## I. Mr. Ladd's Duty Shift from the V-22 Program to the CH-47 Program

Mr. Ladd's initial duties as a final assembly inspector were on the V-22 Program as a

---

[1]Tool crib attendants issue, receive and transfer tools as needed. This is an entry level position.

-4-

second-shift inspector.[2]  During his time in that program in 2000 and 2001, Mr. Ladd asserts that

he was the target of direct verbal harassment by Walter Atwood, his first line supervisor.  Mr.

Ladd alleges that Mr. Atwood ridiculed him for being Native American, calling Mr. Ladd

offensive and insulting names like "wild Indian" and "Two Dogs Fucking," later shortened to

"Two Dogs."

Mr. Ladd claims that he reported the harassment to his supervisor, Thomas DiCola, and

the head of the V-22 Program, John Hilaman.  He also asserts that Tom Coyle, plant manager,

and Mr. Hilaman spoke with him about the harassment after Mr. Ladd gave a sworn statement in

support of Patrick Alibi, an African American employee who allegedly had been verbally

harassed by Mr. Atwood.  However, Mr. DiCola and Mr. Hilaman testified that they were

unaware of any problems between Mr. Ladd and Mr. Atwood.  See, Motion, Ex. D (DiCola Dep.)

at 34-36; Ex. E (Hilaman Dep.) at 15.  Mr. Ladd never filed a written complaint about Mr.

Atwood.[3]

In October 2001, Boeing assigned Mr. Ladd to work on the Chinook CH-47 program on

second shift.   At that time Tran Ngoc oversaw the movement of inspectors between the V-22

Program and the CH-47 Program.  At the time Mr. Ladd was moved into the CH-47 Program,

Mr. Ngoc was unaware that Mr. Ladd was Native American or that he had had problems with

Mr. Atwood.  See, Motion, Ex. G (Ngoc Decl.) at ¶¶ 2-6.  When Mr. Ladd filed a grievance over

his transfer, Boeing accepted the statements of supervisor, Dave Wynn, to the effect that Mr.

---

[2]Working the second shift entitles employees to a 10 percent pay premium.

[3]In contrast, Mr. Alibi filed an Ethics Complaint against Mr. Atwood on September 26,
2001.  Boeing responded quickly, deciding to terminate Mr. Atwood's employment on October
3, 2001.  See, Motion, Ex. A (Lincoln Decl.) at ¶ 3.

Ladd could not work with other employees in the V–22 Program.[4]

After Mr. Ladd began work in the CH-47 Program, Paul Foley, a supervisor, moved him from the final assembly line to the modification center. Mr. Foley states that, at that time, he was unaware that Mr. Ladd was Native American or that Mr. Ladd had had problems with Mr. Atwood. See, Motion, Ex. H (Foley Decl.) at ¶¶ 5-6. He stated that he moved Mr. Ladd to the modification center because of increased levels of work there. Id. ¶ 4. Mr. Ladd asserts that Mr. Foley was aware of his minority status and had been aware of it since even before he entered the V-22 Program. See, Answering Brief Appx. at 016. Believing that his transfers and reassignments were incongruent with his skill, experience and authority, Mr. Ladd filed an internal charge with Boeing's equal employment opportunity office and with Boeing's office of ethics. See Motion, Background ¶ 10. His complaint about his change in duties was not substantiated, and he never pursued EEOC action. Id.

### ii. August 2003 Discipline

On July 31, 2003, Ralph Wood, United States Army representative, was at Boeing's Ridley Park facility. As he was walking past an aircraft Mr. Ladd allegedly had inspected, Mr. Wood noticed "obvious structural cracks" in a pylon on the aircraft. This observation "lead [sic] to a more in-depth inspection revealing additional structural cracks that were not documented by the inspector." Motion, Ex. N (Employee Report of Aug. 19, 2003).[5]

---

[4]Mr. Ladd asserts that Mr. Wynn's justification for his move was untrue. See, Pl.'s Resp. to Def.'s Statement of Undisputed Facts ¶¶ 7-8.

[5]Mr. Ladd disputes Boeing's account of this situation. He argues that the most severe problems with the aircraft were not revealed until the pylon was physically removed and

Boeing asserts that the defects that Mr. Ladd missed on the aircraft were severe.  David Wynn, his then supervisor, explained that the defects were the type that "could have had potentially catastrophic results," including the "loss of human life or aircraft."  Motion, Ex. O (Wynn Dep.) at 205; see also, Motion, Ex. P (Hudson Dep.) at 153 (explaining that the defects were "very visible structural deficiencies that were found by the customer that, in the customer's opinion, were blatantly obvious and should have been discovered by the inspector performing the job.")

Following his visit to the Boeing facility and his observation of the defects in the aircraft, Mr. Wood, on behalf of the Army, contacted Tim Coyle, then director of operations for Boeing's Ridley Park facility.  Motion, Ex. Q (Coyle Decl.) at ¶ 2.  After speaking with Mr. Wood, Mr. Coyle determined that "[b]ecause of the egregious nature of the[] workmanship violations, [...] Ladd had to be appropriately disciplined, and [Mr. Coyle] asked that Ladd be issued corrective action appropriate under the labor contract for significant violations."  Id. ¶ 5.  Mr. Coyle asserts that, at that time, he did not know Mr. Ladd was Native American and was unaware of any problems between Mr. Ladd and Mr. Atwood.  Id. ¶¶ 6-7.

Mr. Ladd was indefinitely suspended from work without pay.  Later, after negotiations with the union, Boeing converted his suspension to a ten-day disciplinary leave of absence.  The original basis for the discipline was "dereliction of duty" and "willful neglect of job responsibility."  Motion, Ex. R.  Boeing later changed this to "workmanship."  Motion, Ex. S.  Mr. Ladd filed a grievance with the union challenging his suspension, but the union did not

---

examined, something Mr. Ladd says he was never told to do.  See, Pl.'s Response to Def.'s Statement of Undisputed Facts ¶ 12.  However, regardless of their severity, the problems caught the attention of the military representative that day.

pursue it.  Motion, Ex. T.

### iii. Mr. Ladd's Return to Work

After the August 2003 disciplinary incident, Mr. Ladd returned to work at the CH-47 modification center.  He was placed on the day shift rather than the second shift (thus losing the 10 percent second-shift premium).  Boeing informed him that the move was made to facilitate additional training, but Mr. Ladd disputes this explanation, alleging that he did not receive any training that was not given to all inspectors in the center.  See, Pl.'s Response to Def.'s Statement of Undisputed Facts ¶ 17.  Mr. Ladd remained on the day shift for six months before moving again to the second shift where he worked under supervisor Dan Deardorff.[6]  Mr. Ladd worked second shift in the modification center with one other final inspector, Stephen Smith.  Among other tasks, the people in this unit inspected used parts that arrived from Summit Aviation.

In early 2004, the backlog of Summit Aviation parts was increasing.  As a result, management instructed Mr. Deardorff to rectify the problem.  Mr. Deardorff ultimately assigned Mr. Ladd to work full-time on the parts backlog.  He testified that he chose Mr. Ladd over Mr. Smith for the project because he believed that Mr. Ladd was a "more detailed inspector than Mr. Smith" and thought that Mr. Ladd's "skills were a little bit greater" for the task.  Motion, Ex. U (Deardorff Dep.) at 62, 83-84.  Mr. Ladd continued working on salvaged parts in the modification center for more than a year and a half.  He asserts that he repeatedly requested a transfer during this time but was unreasonably held in the position.  In contrast, Frank Reinoehl,

---

[6]Mr. Ladd asserts that he requested an immediate return to second shift, but his supervisor, Dave Wynn, refused.  The union became involved, and after six months, Mr. Ladd was transferred to second shift.  Pl.'s Response to Def.'s Statement of Undisputed Facts ¶ 17.

another final assembly inspector, spent only five months working on salvaged parts in the

modification center.  See, Pl.'s Response to Def.'s Statement of Undisputed Facts ¶ 19.

Mr. Ladd maintains that he was treated differently than Mr. Smith during this period.  He

asserts that Mr. Smith was allowed to work overtime in other buildings, thus working on both

salvaged parts and aircrafts, while Mr. Ladd worked overtime only on salvaged parts.

In 2005, Donald Bilderback replaced Mr. Deardorff as Mr. Ladd's supervisor.  Mr. Ladd

wore a Native American t-shirt to work one day, and Mr. Bilderback told him he needed to "give

it up" and that "you guys lost the battle a long time ago."  As a result, Mr. Ladd filed an internal

complaint.  George Lincoln, Boeing's EEO investigator, immediately contacted Mr. Ladd.  Three

days after Mr. Ladd's complaint, Mr. Lincoln met with Mr. Bilderback and his supervisor, Joe

Toriello.  The men agreed that Mr. Bilderback would refrain from making any discriminatory

comments in the future.  Mr. Ladd has not filed any additional complaints about Mr. Bilderback.

### iv.   Mr. Ladd was Offered and Accepted Assignments in Process Surveillance, but Declined a Promotion to Preflight Inspector

In 2005, Mr. Ladd was offered and accepted the option of working assignments in process

surveillance.  While Mr. Ladd admits this fact, he asserts in Plaintiff's Answering Brief in

Opposition to Defendant's Motion for Summary Judgment ("Answering Brief") that he had

expressed interest in this position starting in March 2003, but was not given the opportunity to

work these assignments.  Instead, men who had not expressed interest in it were assigned to

process surveillance, according to Mr. Ladd.

In July 2006, Mr. Ladd was offered a promotion to pre-flight inspector, a labor grade 13

position. However, he declined the position, citing personal reasons. <u>See</u>, Motion, Ex. X.

During his deposition, Mr. Ladd explained that he turned down the promotion because "I kind of

liked what I was doing with process surveillance" and because, with his status in the department,

"I'm making more money as a labor grade 11 than these guys are as a 13." Motion, Ex. B (Ladd

Dep.) at 127.

### v. Mr. Ladd's Overtime Work

Mr. Ladd alleges that he was generally denied overtime by various supervisors in

different programs from 2001 through 2006.[7] He asserts that these denials violated provisions of

the collective bargaining agreement between his union and Boeing. Such provisions specify that

Boeing is obligated to "make a demonstrable good faith effort to make equal distribution of

overtime work among the available qualified employees within shops, plants and on each shift."

---

[7]In his deposition, Mr. Ladd could not identify any particular manager who inappropriately denied him overtime or specific dates he was not allowed to work overtime. <u>See</u>, Motion, Ex. B at 104, 117. He did testify that he believed Seb Arrigo had told Mr. Bilderback not to let him work overtime, but Mr. Ladd allegedly heard this from Roy Basher who heard it from Mr. Bilderback who, in turn, heard it from Mr. Arrigo. As such, the information is hearsay many times over and cannot be relied upon by the Court. <u>Blackburn v. United Parcel Serv.</u>, 179 F.3d 81, 95 (3d Cir. 1999) ("[A] hearsay statement that is not capable of being admissible at trial should not be considered on a summary judgment motion.")

In Plaintiff's Response to Defendant's Statement of Undisputed Facts, Mr. Ladd now includes both dates he was available to work overtime (though without information about whether overtime was available to be worked) and comparisons between himself and other workers (including Mr. Scafide, Mr. Ohanlan, Mr. Croft, and, in particular, Mr. Smith) regarding the amount of overtime worked. <u>See</u>, Pl.'s Response to Def.'s Statement of Undisputed Facts ¶ 24. Although Mr. Ladd earned more overtime than other similarly situated employees between January 2002 and May 2006, he offers evidence that during shorter time periods within that larger range, he was not given equal access to overtime. Without information about how much overtime was available and who was making decisions about which employees were offered overtime, issues of material fact remain concerning Mr. Ladd's assertions about overtime.

Motion, Ex. Y at 89.

Boeing presents evidence that Mr. Ladd earned more than $82,000 in overtime between January 2002 and May 2006. This is higher pay than any other final assembly inspector on his shift and in his classification. For instance, Stephen Smith earned $73,000 in overtime during the same period. See, Motion, Ex. C (Fredrickson Decl.) ¶¶ 3, 5.

During his employment at Boeing, Mr. Ladd filed various grievances concerning overtime.[8]  Within their internal procedures, Boeing and the union determined that some of the grievances were without merit. See, Motion, Ex.AA (concluding that Mr. Ladd's overtime "grievance is frivolous and only serves to slow the grievance process.") However, Boeing compensated Mr. Ladd for missed overtime pay after finding that other grievances  had merit. For example, when Mr. Ladd was listed in a different shop number due to an apparent clerical error, Boeing paid him 150 hours worth of overtime as compensation. See, Motion, Ex. BB. Another time, Boeing paid Mr. Ladd for four hours of missed overtime. See, Motion, Ex. CC.

### B. Mr. Ladd's Allegations of Racial/National Origin Discrimination

On September 19, 2003, Mr. Ladd filed a charge of discrimination with  the EEOC and the Pennsylvania Human Rights Commission ("PHRC") alleging racial discrimination. See, Motion, Ex. DD. Mr. Ladd asserted that he had been suspended because of his race while other

---

[8] In addition to the grievances discussed below, Mr. Ladd filed a grievance on May 9, 2006. He asserts that during a specific period in 2005 other inspectors were allegedly on "open book" overtime (meaning they could work as much overtime as they wanted). He says he was offered very little overtime in salvaged parts and no overtime outside that department. Although Mr. Ladd filed a grievance based on this allegation, no review had been scheduled prior to July 2007. See, Pl.'s Response to Def.'s Statement of Undisputed Facts ¶ 27.

similarly situated white employees were not terminated for the same conduct. Mr. Ladd acknowledged that as a result of internal grievance procedures, the company reduced his indefinite suspension to a ten-day suspension. He received his right to sue letter from the EEOC on October 6, 2005, and he filed suit within the required 90 days, on January 4, 2006.[9]

Mr. Ladd filed a second Charge of Discrimination with the EEOC and the PHRC on July 13, 2004. See, Motion, Ex.EE. He asserted that in retaliation for his filing of the original charge, Boeing changed his duties and responsibilities, limited his access to overtime opportunities, and hampered his opportunity for promotion within the company. After Mr. Ladd filed the second charge, the EEOC assigned an investigator and took a position statement. However, neither the EEOC nor the PHRC took action or made a determination about the case. Mr. Ladd's file was closed on February 14, 2006. He demanded a right to sue letter from the EEOC on July 10, 2006, just shy of 150 days after his case was closed by the Commission.


## III.   DISCUSSION

### A. Exhaustion and Timeliness

Boeing challenges Mr. Ladd's claims both on timeliness and exhaustion grounds. For the reasons set forth below, the Court limits its consideration to those claims directly addressed in

---

[9]In his Answering Brief, Mr. Ladd argues that he has presented a *prima facie* case of retaliation based on his 2003 suspension. See, Answering Brief at 32. However, in his Amended Complaint, Mr. Ladd claims retaliation only for filing a complaint with the EEOC and the PHRC on Sept. 19, 2003, not for making internal complaints prior to his 2003 suspension. Because Mr. Ladd's Amended Complaint alleges only that his August 2003 suspension was motivated by race discrimination, the Court will not consider Mr. Ladd's new arguments regarding unlawful retaliation under Title VII for internal complaints he allegedly made prior to summer 2003 (as presented in Answering Brief § III.C).

the EEOC complaints from 2003 and 2004 and the more generalized claim made under 42 U.S.C. § 1981.

Boeing asserts that Mr. Ladd's Title VII claims for his 2001 move from the V-22 Program to the CH-47 Program and from CH-47 final assembly to the CH-47 modification center are untimely under Title VII.

Prior to filing a Title VII claim, a plaintiff must first bring a charge of discrimination within 300 days of the alleged discriminatory act. Burgh v. Borough Council of Borough of Montrose, 251 F.3d 465, 472 (3d Cir. 2001) (explaining the requirements of 42 U.S.C. § 2000e-5(e)(1)). Mr. Ladd filed his first charge with the EEOC and PHRC on September 19, 2003. Therefore, employment-related events occurring before November 23, 2002 are beyond the proper scope of the charge – and thus beyond the scope of the Title VII claims. Based on this calendar-related calculation, the October 2001 move to the CH-47 program would be outside of the allowable claim period. Thus, Boeing is correct in asserting that Mr. Ladd's October 2001 move to the CH-47 program and his assignment to the CH-47 modification center cannot be challenged under Title VII at this time.

Boeing further argues that Mr. Ladd has failed to properly exhaust administrative remedies for many additional allegations of discrimination. Under Title VII, Mr. Ladd has a duty to exhaust his administrative remedies prior to filing suit. See, e.g., Woodson v. Scott Paper Co., 109 F.3d 913, 924-25 (3d Cir. 1997) (noting that a plaintiff claiming discrimination must exhaust administrative remedies before filing a lawsuit and that the exhaustion requirement is strictly construed); West v. Philadelphia Elec. Co., 45 F.3d 744, 745 (3d Cir. 1995) (holding that filing a charge with an administrative agency is a prerequisite to bringing a lawsuit for discrimination).

Mr. Ladd filed two complaints with the EEOC and the PHRC: one on September 19, 2003 alleging racial discrimination in his indefinite suspension, and one on July 13, 2004 alleging retaliation for the prior complaint. See, Motion, Exs. DD, EE.  In neither charge does Mr. Ladd make any claim concerning denial of work assignments in Process Surveillance, denial of "lead rate," alleged harassment by Walter Atwood, his 2001 move from the V-22 Program to the CH-47 Program, or his 2001 move from CH-47 final assembly to the CH-47 modification center.  Mr. Ladd's claims under Title VII must be limited to his August 2003 discipline and his 2004 shift in duties.

Boeing challenges the timeliness of Ms. Ladd's claim under 42 U.S.C. § 1981, but does not address exhaustion because of its inapplicability.  Claims arising under § 1981 do not require exhaustion of administrative remedies.  See, Swicker v. William Armstrong & Sons, Inc., 484 F. Supp. 762, 769-70 (E.D.Pa. 1980) (exhaustion of Title VII administrative remedies is not a jurisdictional prerequisite to a federal suit alleging discrimination in violation of Section 1981). Accordingly, unlike his Title VII claims, Mr. Ladd's § 1981 claim is not affected by his filings with either the EEOC or the PHRC.

Claims arising under § 1981, however, are subject to a two-year statute of limitations. Wilson v. Garcia, 471 U.S. 261, 266-268 (1985) (when a federal statute does not contain a statute of limitations, the most nearly analogous state statute of limitations applies); Saint Francis College, 481 U.S. at 608 (the statute of limitations for § 1981 is imported from the two-year Pennsylvania state statute applicable to personal injury).  Absent a continuing violation, all discriminatory acts that are alleged to have occurred more than two years prior to the filing of the Complaint are time-barred. See, AMTRAK v. Morgan, 536 U.S. 101, 113 (2002). Mr. Ladd

-14-

alleges that incidents of intentional and unintentional discrimination began in 2001.  He asserts

that acts of retaliation for his complaints about this discrimination, as well as continued acts of

discrimination, began shortly after his first administrative charge in 2003 and lasted through

October 2004.  At this point in time in the life of this litigation, questions of material fact remain

as to how the various incidents may relate to one another and whether they may be linked

together sufficiently to form a continuing violation under § 1981.  Accordingly, for purposes of

summary judgment, the allegations of continuing discrimination are not time barred.  See, Vera v.

Bethlehem Steel Corp., 448 F. Supp. 610, 615 (W.D. Pa. 1978) (citing Bethel v. Jendoco

Construction Corporation, 570 F.2d 1168 (3d Cir. 1978)


**B. Claims I, III, and IV: Title VII and §1981**

Count I of Mr. Ladd's Amended Complaint alleges a race/national origin disparate-

treatment claim under Title VII.  Count III alleges retaliation under the same statute, and Count

IV alleges a race/national origin claim under § 1981.  These three claims must be analyzed under

the burden-shifting analysis developed in McDonnell Douglas Corp. v. Green, 411 U.S. 792

(1973).[10]

Under McDonnell Douglas, Mr. Ladd must first establish a *prima facie* case of

discrimination by a preponderance of the evidence, Texas Dept. Of Community Affairs v.

Burdine, 450 U.S. 248, 252-253 (1981), which merely requires that he "present sufficient

---

[10]See, Farrell v. Planter Lifesavers Co., 206 F.3d 271, 278-79 (3d Cir. 2000) (applying McDonnell Douglas to Title VII retaliation claim); Pamintuan v. Nanticoke Memorial Hosp., 192 F.3d 378, 385 (3d Cir. 1999) (applying McDonnell Douglass to § 1981 claim); Schurr v. Resorts Intern. Hotel, Inc., 196 F.3d 486, 499 (3d Cir. 1999) ("[T]he elements of employment discrimination under Title VII are identical to the elements of a Section 1981 claim.")

evidence to allow a fact finder to conclude that the employer is treating some people less favorably than others based on a trait that is protected under Title VII [of the Civil Rights Act of 1964]." Iadimarco v. Runyon, 190 F.3d 151, 161 (3d Cir. 1999).  "The evidentiary burden at this stage is rather modest: it is to demonstrate to the court that [P]laintiff's factual scenario is compatible with discriminatory intent-i.e., that discrimination *could* be a reason for the employer's action." Coulton v. University of Pennsylvania, 2006 WL 759701, at *5 (E.D. Pa. Mar. 21, 2006) (quoting Marzano v. Computer Science Corp., 91 F.3d 497, 508 (3d Cir.1996) (emphasis in original)).

        To establish a *prima facie* case of race discrimination, Mr. Ladd must show that: (1) he is a member of a protected class, (2) he was qualified for the position, and that (3) he was subject to an adverse employment action, (4) under circumstances that give rise to an inference of discrimination. Verdin v. Weeks Marine Inc., 124 Fed. Appx. 92, 95 (3d Cir. 2005) (citing Goosby v. Johnson & Johnson Med., Inc., 228 F.3d 313, 318-19 (3d Cir. 2000)).  There is a low bar for establishing a *prima facie* case of employment discrimination. Ezold v. Wolf et.al., 983 F.2d 509, 523 (3d Cir. 1993) ("Because the *prima facie* case is easily made out, it is rarely the focus of the ultimate disagreement.")

        If Mr. Ladd succeeds in proving the *prima facie* case, the burden shifts to Boeing to articulate some legitimate, nondiscriminatory reason for its actions. Burdine, 450 U.S. at 252-253. If Boeing does so, in order to defeat summary judgment, Mr. Ladd must show that the stated reason was in fact pretext by pointing to "some evidence, direct or circumstantial, from which a fact finder could reasonably either (1) disbelieve the employer's articulated reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or

-16-

determinative cause of the employer's action." Iadimarco,190 F.3d at 166 (quoting Fuentes v.

Perskie, 32 F.3d 759, 764 (3d Cir. 1994)).  The ultimate burden of persuading the trier of fact

that Boeing intentionally discriminated against Mr. Ladd belongs at all times to Mr. Ladd.  St.

Mary's Honor Center v. Hicks, 509 U.S. 502, 506-507 (1993).

i.      **Mr. Ladd's Allegations of Discrimination Stemming from His August 2003**

      **Suspension**

a.      **Mr. Ladd's *Prima Facie* Case**

      **1.      Member of a Protected Class**

Mr. Ladd is Native American and, thus, is a member of a protected class.  Sarullo v. U.S.

Postal Serv., 352 F.3d 789, 798 (3d Cir. 2003) (plaintiff of Native American ancestry was a

member of a protected class (ethnicity) under Title VII).

      **2.      Qualification for the Position**

Mr. Ladd must show that he was qualified for his position with Boeing; however,

the standard for such a showing at the summary judgment stage is "not onerous." Texas

Department of Community Affairrs v. Burdine, 450 U.S. 248, 253 (1981).  Mr. Ladd has

worked with Boeing since 1975 in a variety of positions, including the one from which he was

suspended, and continues working at the company's Ridley Park facility.  Accordingly, he is

qualified for the position.

3.    **Adverse Employment Action**

Mr. Ladd was indefinitely suspended (and then had a disciplinary 10-day "leave") from his position without pay in August 2003, thus suffering an adverse employment action.

4.    **Circumstances Giving Rise to an Inference of Discrimination**

While the elements of a *prima facie* case may vary depending on the facts and context of the individual situation, "[c]ommon circumstances giving rise to an inference of unlawful discrimination include the hiring of someone not in the protected class as a replacement or the more favorable treatment of similarly situated colleagues outside the relevant class." Wooler v. Citizens Bank, 2006 U.S. Dist. LEXIS 86606, at *16 (E.D. Pa. 2006).

Mr. Ladd argues that the circumstances surrounding his August 2003 suspension give rise to an inference of racial discrimination because the company treated him differently than similarly situated colleagues outside his protected class.  Mr. Ladd was the only Native American working in his job group, and he was the only inspector disciplined for attributable escapements.  Mr. Ladd asserts that Stephen Smith, Tom Cummings and Tom Bell each documented fewer discrepancies in pylons and missed more manufacturing or fabrication problems than he did, but, according to Mr. Ladd, Boeing did not discipline any of the three non-Native American employees.

Additionally, Mr. Ladd asserts that because the company does not discipline inspectors for escapements, his discipline was an anomaly explained by discrimination.  Richard Wysocki, a committeeman for Local 1069 (Mr. Ladd's union) who regularly investigates employee grievances, explained in his declaration that the discrepancies Mr. Ladd missed on the aircraft in

question are known as "escapements." "Escapements can be picked up down the line as the aircraft is further built, or by the customer after the aircraft leaves the plant. Supervisors in final assembly, and upper management, routinely do not discipline final assembly inspectors for an escapement." Answering Brief Appx. A002.

"The evidentiary burden at this stage is rather modest: it is to demonstrate to the court that [P]laintiff's factual scenario is compatible with discriminatory intent-i.e., that discrimination *could* be a reason for the employer's action." Coulton, 2006 WL 759701, at *5. Accordingly, the Court finds that Mr. Ladd has adduced sufficient evidence in the record to state a *prima facie* claim of race discrimination.

**b.    Boeing's Burden to Proffer Non-Discriminatory Reasons for its Actions**

The Third Circuit has defined as "relatively light" an employer's burden to proffer legitimate non-discriminatory reasons for adverse employment actions. Fuentes, 32 F.3d at 763. Boeing has presented evidence that Mr. Ladd failed to catch several obvious and severe problems with an aircraft part. Those problems were spotted by the customer's representative, who was merely walking past the aircraft at the time. The customer was angered by the results of this inspection, and the customer's representative contacted Tim Coyle, Boeing's director of operations. Based on that conversation, Mr. Coyle decided to discipline whoever was the inspector responsible for the faults. Given the severity of Mr. Ladd's alleged mistake and the customer's reaction, Boeing has met the limited burden an employer must bear with respect to explaining its reasons for its action.

c.     **Whether Boeing's Articulated Reasons for Mr. Ladd's Suspension were a Pretext**

Because Boeing has introduced legitimate, non-discriminatory reasons for disciplining

Mr. Ladd in August 2003, Mr. Ladd must identify evidence at least suggesting that the stated

reasons for Boeing's actions were, in fact, pretext.  To survive summary judgment when an

employer has proffered a legitimate, non-discriminatory reason for its action, a plaintiff must:

> point to some evidence, direct or circumstantial, from which a factfinder could
> reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2)
> believe that an invidious discriminatory reason was more likely than not a motivating or
> determinative cause of the employer's action.

Fuentes, 32 F.3d at 764.  A plaintiff must demonstrate "such weakness, implausibilities,

inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons

for its action that a reasonable fact finder could rationally find them unworthy of credence, and

hence infer that the employer did not act for the asserted nondiscriminatory reasons." Id. at 765

(citations omitted).  To demonstrate that an employer's proffered reasons were pretextual,

"however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken,

since the factual dispute at issue is whether discriminatory animus motivated the employer, not

whether the employer is wise, shrewd, prudent, or competent." Id.  See also, Kautz v. Met-Pro

Corp., 412 F.3d 463, 467 (3d Cir. 2005).  The plaintiff's burden of casting doubt on an

employer's stated reasons for an employment decision is characterized in this circuit as a

"difficult" one. Fuentes, 32 F.3d at 765.

Mr. Ladd identifies a number of Boeing employees who have stated unequivocally that

final assembly inspectors are not reprimanded or disciplined for escapements. See, Pl.'s

Response to Def.'s Statement of Undisputed Facts at 29.  Mr. Ladd's committeeman, Rich

Wysocki, stated in his declaration that in his 30 years with Boeing during which he had regular

involvement with grievances, he has not heard of any inspector being disciplined or suspended

for an escapement, except Stephen Smith. Mr. Smith was written up in 2002 for "hot stamping"

a part, but never officially disciplined. Answering Brief Appx. at A001-007. Mr. Ladd

continues by noting that Boeing has uncovered numerous additional problems in the same batch

of pylons, but has yet to discipline any other inspectors.

Boeing denies Mr. Ladd's allegation that inspectors are never disciplined for missing

escapements, see, Motion at 24. Boeing asserts that the written warning given to Stephen Smith

constituted minor discipline for a minor workmanship-related incident, and Boeing points to

deposition testimony from Messrs. Wynn, Deardorff, and Hilamon, all of whom said that Boeing

has disciplined inspectors for failing to catch escapements. Mr. Wynn and Mr. Deardorff even

identified, albeit vaguely, examples. See, id. at 24.[11]

---

[11]Boeing attached to its Reply to Plaintiff's Brief in Opposition (Docket No. 45) a
declaration from Boeing employee John D. Newborg. The declaration states, in part, that Mr.
Ladd's suspension was not inappropriate or wholly unusual because Boeing also terminated the
employment of one Theodore Karlick, a white final assembly inspector who failed to catch a
serious mechanical defect on an aircraft. See, Id., Ex. 1. The declaration provides no details
about when or where this Karlick incident occurred. Accordingly, it is too vague to be useful in
determining whether an employee outside Mr. Ladd's protected class, but similarly situated *in all
other material aspects*, was treated the same. See, Dill v. Runyan, 1997 U.S. Dist. LEXIS 4355,
at *12 (E.D. Pa. 1997) ("[P]roposed analogues must be similarly situated in all 'material
aspects.'")
    Mr. Ladd filed a Motion to Strike the Declaration, or, in the Alternative, for Leave to File
Supplemental Declaration in Opposition ("Motion to Strike") (Docket No. 48). Mr. Ladd's
supplemental declaration asserts that files from Mr. Ladd's union do not contain Mr. Karlick's
name. Mr. Ladd's declaration also contains a variety of inadmissible hearsay in the form of Mr.
Ladd's repetition of information he alleges to have heard from other union members. See,
Motion to Strike, Ex. A.
    The Court declines to strike Mr. Newborg's declaration, grants Mr. Ladd's Motion for
Leave to File the Supplemental Declaration, and finds that neither Mr. Newborg's declaration nor
Mr. Ladd's supplemental declaration provide admissible evidence sufficient to clarify any of the

Boeing presents a final piece of evidence aimed at rebutting Mr. Ladd's evidence of pretext. The company argues that the person who decided to discipline Mr. Ladd was the person contacted by the irate customer representative, namely, Tim Coyle. After speaking with Ralph Wood, the Army representative who noticed the severe problems with the aircraft, Mr. Coyle decided to discipline the responsible inspector. He asked that Mr. "Ladd be issued corrective action appropriate under the labor contract for significant violations." Motion, Ex. Q (Coyle Decl.) ¶5. As of the time he made this decision, Mr. Coyle asserts that he did not know Mr. Ladd was a Native American or that Mr. Ladd had earlier complained of problems with Mr. Atwood. See, Id. ¶¶5-7. If such allegations are true, Boeing is correct in asserting that it is logically impossible for Mr. Ladd's discipline to be illegal race discrimination. See, Robinson v. Adams, 847 F.2d 1315, 1316 (9th Cir. 1988) ("an employer cannot intentionally discriminate against a job applicant based on race unless the employer knows the applicant's race").

However, Mr. Ladd argues that by August 2003 Mr. Coyle already was aware that Mr. Ladd is a Native American. Mr. Ladd maintains that Mr. Coyle was present in 2001 when Mr. Ladd gave a statement in support of an African American employee who had alleged harassment by Mr. Atwood. Answering Brief Appx at A018. "Both Tim Coyle and John Hilaman knew I was Native American and, therefore, a minority employee, because I was interviewed in the Abili matter, specifically about Mr. Atwood's harsh racial slander directed towards me because of my Native American race." Id.

Issues of material fact remain in this case as to whether Boeing treated employees outside Mr. Ladd's protected class differently than Mr. Ladd and whether the person who disciplined Mr.

lingering issues of material fact on the pertinent issues.

Ladd was or was not aware of his race and his allegations of prior racial harassment. When viewed in the light most favorable to Mr. Ladd, the evidence could support a conclusion that discrimination was more likely than not a motivating cause of Mr. Ladd's suspension. Accordingly, the Court will not grant summary judgment in favor of Boeing on this claim.

ii.     **Mr. Ladd's Allegations of Retaliation Stemming from Reassignments and a Lack of Overtime Following his September 2003 EEOC/PHRC Complaint**

In order to make out a *prima facie* case of retaliation under Title VII, an employee must demonstrate that (1) he engaged in a protected activity as defined by the Act; (2) his employer took an adverse employment action after or contemporaneous with the protected activity; and (3) a causal link between the protected activity and the adverse employment action exists. Weston v. Pennsylvania, 251 F.3d 420, 430 (3d Cir. 2001).

If Mr. Ladd establishes this *prima facie* case of retaliation, then the McDonnell Douglas analysis discussed above applies, and the burden of production shifts to Boeing to articulate a legitimate, non-discriminatory reason for any adverse employment actions. Once Boeing meets "this relatively light burden," Mr. Ladd must show by a preponderance of the evidence that this reason is mere pretext. See, 2007 Weiler v. R&T Mech. Inc., U.S. App. LEXIS 25803 at *5-6 * (3d Cir. 2007).

a.    **Mr. Ladd's *Prima Facie* Case**

1.    **Engagement in a Protected Activity**

The first prong of a Title VII retaliation claim requires, at minimum, an informal protest of discriminatory employment practices. Accordingly, a generalized complaint of unfairness will not suffice. Barber v. CSX Distrib. Servs., 68 F.3d 694, 702 (3d Cir. 1995). The plaintiff must oppose a practice made unlawful under the applicable statute. Id. At 702.

At a minimum, Mr. Ladd's claims to the EEOC and the PHRC in September 2003 constitute a protected activity.

2.    **Adverse Employment Action**

Boeing asserts that following the filing of his September 2003 EEOC/PHRC complaint, Mr. Ladd suffered no adverse employment action. "[A]n adverse employment action is one which is 'serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment.'" Cardenas v. Massey, 269 F.3d 251, 263 (3d Cir. 2001) (quoting Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (3d Cir. 1997)). "Minor actions, such as lateral transfers and changes of title and reporting relationships, are generally insufficient to constitute adverse employment actions." Langley v. Merck & Co., Inc., 186 Fed. Appx. 258, 260 (3d Cir. June 15, 2006) (citations omitted).

Mr. Ladd argues that he was wrongly forced to work on salvaged parts in the modification center, which he describes as the dirtiest, most degrading job in the center. Although he repeatedly sought reassignment, the company refused to grant him his requested relief. He asserts that he wanted to advance at Boeing, but that remaining in salvaged parts

-24-

limited his opportunities to advance in the company and hindered his ability to stay current with complex aircraft systems.

Mr. Ladd also asserts an overarching retaliatory action lasting for years after his first EEOC/PHRA complaint: the inappropriate denial of overtime opportunities. "Lack of overtime opportunities ... is a form of reduction in compensation." Albright v. City of Philadelphia, 399 F. Supp. 2d 575, 587 (E.D. Pa. 2005). Boeing argues that Mr. Ladd was not denied overtime, citing the fact that between January 2002 and May 2006 he earned more in overtime than any other final assembly inspector – approximately $82,000. In addition, the company cites Mr. Ladd's deposition, in which he admitted that he regularly turned down overtime on weekdays to spend time with his wife and sometimes refused overtime on weekends. See, Motion, Ex. B at 90-91.

Mr. Ladd asserts that in October 2004 Boeing allotted 400 hours of overtime for salvaged aircraft pylon inspection. Under the collective bargaining agreement, Mr. Ladd had full demand rights for the overtime on a 50/50 basis with Mr. Smith, but he was assigned only a small portion of the overtime. Less senior final assembly inspectors were assigned overtime on the pylons. See, Answering Brief at 47. Mr. Ladd also alleges that he was improperly denied overtime after he was transferred from department 8175 to department 8150 in December 2004, as well as in 2005 when he earned less in overtime than Mr. Smith. See, Answering Brief at 48-51. Mr. Ladd's specific comparisons with other inspectors provide ample evidence of an adverse employment action for purposes of surviving summary judgment.

3.     **Causal Link between the Protected Activity and the Adverse Employment Action**

Mr. Ladd seems to assume that if he was subjected to an adverse employment action following his EEOC/PHRC claim, then he has established a *prima facie* case of retaliation. Although he suggests he perceived various hints that his lack of overtime access may have been retaliatory (i.e. negative comments from managers), he does not analyze these hints in terms of any case law. Boeing argues that there was no adverse employment action, but entirely neglects to directly address the causal link prong for a *prima facie* retaliation claim under Title VII.

The main factors in determining a causal link between a protected activity and termination are timing and a pattern of antagonism between the protected activity and the adverse employment action. Garabedian v. Lone Star Steakhouse & Saloon, 2007 U.S. Dist. LEXIS 44759, *6 (E.D. Pa. June 20, 2007). The Third Circuit Court of Appeals has noted that its "case law is 'seemingly split' as to whether temporal proximity between the protected activity and the alleged retaliatory act can be sufficient in itself to create an inference of a causal connection for the purposes of a *prima facie* case of retaliation." Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 (3d Cir. 2000). The court cautioned that any perceived split was not an inconsistency in analysis, but rather was caused by the necessarily fact-based distinction among cases. Different rulings result from the temporal proximity between the activity and the alleged retaliation as well as the specific context in which events occur. Id.

While a short period of time between participation in a protected activity and an adverse employment action is not itself sufficient to establish a causal link in a vacuum, such an abbreviated time period case factor heavily into the causal inference. Garabedian, 2007 U.S.

-26-

Dist. LEXIS 44759, at *8 ("[a] short period of time...factors into the causal inference") (citing

Fasold v. Justice, 409 F.3d 178, 189-90 (3d Cir. 2005) (discussing a period less than one month

and noting that "a short period of time" may provide the evidentiary basis of an inference of

retaliation)); Zelinski v. State Police, 108 Fed. Appx. 700, 706 (3d Cir. 2004) (stating two

months is "much more 'unusually suggestive' than a period of ten months); Silvestre v. Sere

Care, Inc., 2000 U.S. Dis. LEXIS 25267, at *26 (E.D. Pa. Dec. 30, 2002) (noting that two months

"appears to be a relatively short time" between the protected activity and adverse action).

Mr. Ladd has presented evidence that he was forced to work in what he claims was a

degrading position with few opportunities for advancement immediately after he filed a

complaint with the EEOC and the PHRC.  He argues that he was kept in this position much

longer than any other comparably experienced employee.  He also claims that in that position, he

was given less access to overtime work than other, similarly situated inspectors.  Given that Mr.

Ladd has presented allegations of ongoing poor treatment (in particular, a lack of opportunities to

work overtime) following his complaint, and Boeing has failed to address the issue of causation,

when viewing the evidence in the light most favorable to Mr. Ladd, issues of material fact remain

concerning the causal link between the protected activity and the adverse employment action.

Accordingly, the Court denies summary judgment on Mr. Ladd's retaliation claim.


iii.   **Mr. Ladd's Allegations of National Origin Discrimination under Section 1981[12]**

Mr. Ladd asserts that he has been discriminated against in violation of Section 1981 since

---

[12]In its Motion for Summary Judgment, Boeing purports to analyze Mr. Ladd's claims under Section 1981 and Title VII concurrently.  Boeing fails to address the possibility of Mr. Ladd establishing a continuing violation under Section 1981.

at least 2001. He alleges a continuing violation beginning when Mr. Atwood harassed him for

being Native American and lasting through at least 2005 when he received less overtime than

other inspectors. It is not clear whether all the alleged incidents of discrimination are connected

in the manner necessary to establish a continuing violation (particularly in light of the fact that

some of the decision-makers assert that they were unaware of Mr. Ladd's status as a minority),

but the parties hotly dispute the material facts supporting this claim. Therefore, Mr. Ladd's

Section 1981 claim survives summary judgment.


C.      **Count 2: Title VII Disparate Impact**

Ladd's final claim in this action is a race/nation origin Title VII claim for disparate

impact. A violation of Title VII may be established in two ways: through disparate treatment or

disparate impact. Such a claim must target " a specific employment practice [that is] neutral on

its face but caus[es] a substantial adverse impact on a protected group." EEOC v. Metal Servs.

Co., 892 F.2d 341, 346 (3d Cir. 1990). Evidence in these cases generally focuses on statistical

disparities, rather than specific incidents, and on competing explanations for those disparities.

Watson v. Ft. Worth Bank and Trust, 487 U.S. 977, 987 (1988).

The disparate impact theory of discrimination under Title VII was judicially created in the

seminal case of Griggs v. Duke Power Co., 401 U.S. 424 (1971). In embracing disparate impact

theory, the Supreme Court recognized that Title VII was meant not only to proscribe overt

discrimination, but also to prohibit "practices that are fair in form, but discriminatory in

operation." Lanning v. SEPTA, 181 F.3d 478, 485 (3d Cir. 1999) (quoting Griggs, 401 U.S. at

431). The original claims of disparate impact discrimination related to employers' use of

-28-

objective policies, such as standardized tests, that operated to discriminate against a particular group, yet were not demonstrably related to the jobs for which they were used. See, e.g., Griggs, 401 U.S. at 425-426.   As the law in this area matured, courts began to recognize that unintentional discrimination could also arise from employment decisions based on the exercise of personal judgment or subjective criteria.   Watson, 487 U.S. at 989.

In Watson, the Supreme Court held that disparate impact analysis may be applied to subjective, as well as objective, employment practices, reasoning that this expansion was necessary to combat the subtle racism and stereotyping that can compel subjective decisionmaking.[13] Id. at 990.  However, recognizing that this expansion could potentially chill legitimate business practices, such as that of hiring based on loyalty, common sense, and creativity, and creates the risk of instilling a preferential quota system, the Supreme Court held that in order to bring a claim of disparate impact discrimination against an employer based on subjective criteria, a plaintiff must be very specific.  Id. at 991.  He must isolate and identify the specific employment policies, not simply the presence of subjective decision-making itself,  that create statistical disparities, i.e. impose a disparate impact, on a protected group.  Id. at 994. Further, plaintiffs may not present less evidence against a defendant for unintentional discrimination than is required to prove intentional discrimination.   Watson, 487 U.S. at 987.

Mr. Ladd has neither identified specific employment practices having disparate impact on his protected group, nor made any showing of resulting statistical disparities. It may be that  Mr.

_____

[13]Our court of appeals has observed that the Supreme Court was quite clear that what is required by Title VII is "the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification." Lanning, 181 F.3d at 485.

Ladd confuses disparate treatment of a protected individual with disparate impact on a protected group. However, bare allegations of discriminatory animus toward Mr. Ladd do not state a claim of disparate impact. See, Ramos v. EquiServe, 146 Fed. Appx 565, 567 (3d Cir. 2005) (upholding summary judgment where a plaintiff alleged only actions amounting to personal adverse impact, not institutional disparate impact.)   Considering the facts in the light most favorable to Mr. Ladd, he has failed to present evidence supporting even the most rudimentary *prima facie* case of disparate impact.

## IV.   Conclusion

For the reasons set forth above, Mr. Ladd's Motion to Strike the Declaration of John Newborg, or, in the Alternative, for Leave to File Supplemental Declaration in Opposition is denied as to striking Mr. Newborg's declaration but granted as to permit the filing Mr. Ladd's supplemental declaration.  Mr. Ladd's supplemental declaration is hereby made part of his record in opposition to Boeing's Motion for Summary Judgment.

Boeing's Motion for Summary Judgment is granted as to Count II (Title VII disparate impact) and denied as to Count I (Title VII disparate treatment), Count III (Title VII retaliation) and Count IV (§ 1981 discrimination) because of the presence of genuine disputes of material facts.

An appropriate Order consistent with this Memorandum follows.

BY THE COURT:

Gene E.K. Pratter
UNITED STATES DISTRICT JUDGE

-30-

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BARRY MICHAEL LADD,<br>        Plaintiff | : | **CIVIL ACTION** |
| | : | |
| **vs.** | : | |
| | : | |
| THE BOEING COMPANY,<br>        Defendant | : | **NO. 06-28** |

### ORDER

**AND NOW** this 8th day of February 2008, upon consideration of Plaintiff's Motion to Strike Declaration, or, in the Alternative, for Leave to File Supplemental Declaration (Docket No. 48) and Defendant's Response (Docket No. 51), **IT IS HEREBY ORDERED** that the Motion is DENIED in part as to striking Mr. Newborg's declaration, but GRANTED in part as to Plaintiff's request to file a supplemental declaration.  Plaintiff is granted leave to file his supplemental declaration dated November 30, 2007, in the form attached to his Motion for Leave, and the supplemental declaration is hereby made part of Plaintiff's record in opposition to Defendant's Motion for Summary Judgment.

Upon consideration of Defendant's Motion for Summary Judgment (Docket No. 36), Plaintiff's Response in Opposition (Docket No. 41), and Defendant's Reply (Docket No. 45), **IT IS HEREBY ORDERED** that the Motion is GRANTED as to Count II and DENIED as to Counts I, III and IV.

BY THE COURT:

Gene E.K. Pratter
UNITED STATES DISTRICT JUDGE

-31-